**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **MARIO ALLEN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No. 06-CV-4660** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | **Mag. Judge Michael T. Mason** |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Michael T. Mason, United States Magistrate Judge:

The claimant, Mario Allen ("Allen" or "claimant") filed a motion for summary judgment seeking judicial review of the final decision of the Commissioner of Social Security (the "Commissioner") denying his claim for Disability Insurance Benefits and Supplemental Security Income under the Social Security Act, 42 U.S.C. §§ 416(i), 423, and 1382(a)(3)(A). The Commissioner filed a cross-motion for summary judgment asking that we uphold the decision of the Administrative Law Judge ("ALJ"). This Court has jurisdiction to hear this matter pursuant to 42 U.S.C. § 405(g). For the reasons set forth below, Allen's motion for summary judgment is granted, and the Commissioner's motion for summary judgment is denied. This case is remanded to the ALJ for further proceedings consistent with this opinion.

**PROCEDURAL HISTORY**

Allen filed an application for disability benefits on February 25, 2004, alleging an

onset date of January 10, 2004.  (R. 63-65, 263-65).  His application and subsequent request for reconsideration were both denied.  (R. 32-38, 45-48, 266-76).  Allen then filed a timely request for a hearing.  (R. 20-21).  ALJ Robert White ("ALJ White") presided over a hearing on August 23, 2005.  (R. 277-346).  On November 30, 2005, ALJ White issued a written opinion denying Allen's request for benefits.  (R. 25-31).  The appeals council denied Allen's request for review (R. 4-6, 16-18) and the ALJ's decision became the final decision of the Commissioner.  *See Zurawski v. Halter*, 245 F.3d 881, 883 (7th Cir. 2001).  Allen subsequently filed this action in the district court.

**BACKGROUND**

**I.    Medical History**

Allen claims he is disabled due to, among other things, systemic lupus erthematosus ("SLE" or "lupus"), extreme fatigue, insomnia, and cramping in his fingers and toes.  (R. 13-14).  To support his claim for benefits, Allen submitted medical records covering the time period between 2000 and 2005.  (R. 170-262).  Those records are included in the administrative record and, along with the testimony offered at trial, form the basis of ALJ White's opinion.  (R. 25).

The medical records indicate that Allen made frequent visits to Saint James Hospital ("St. James") during 2000 and 2001.  (R. 170-95).  On October 24, 2000, he reported to St. James complaining of a stomach ulcer, headaches, and weight loss.  (R. 190).  Treatment notes indicate possible dyspepsia, the impairment of the ability to digest food.  (R. 190).  Allen returned to St. James on October 31, 2000, complaining of back pain and the flu.  (R. 189).   The examining physician noted that Allen's condition had not improved since his last visit.  (*Id.*).  On November 28, 2000, a physician at St.

James provided treatment for stomach pain and the flu. (R. 186).

On January 25, 2001, Allen visited the emergency room at St. James after experiencing a burning pain in his testicles while "lifting on the job." (R. 170-72, 174). On March 30, 2001, Allen received treatment for an enlarged and painful salivary duct. (R. 185). Allen returned to St. James on June 30, 2001 and reported upper back pain and difficulty taking deep breaths. (R. 184).

On February 7, 2002, Allen sought treatment from Advocate South Suburban Hospital. (R. 201). The examining physician noted a history of enlarged lymph nodes. (*Id.*). A CT scan performed on that date revealed a small soft tissue structure which the radiologist believed might represent residual thymus. (*Id.*). The CT scan also revealed tiny lymph nodes, which the radiologist classified as within normal limits, and a "borderline enlarged lymph node" in the right axillary region. (*Id.*). The radiologist noted that Allen's "lung parenchymal window settings show the presence of reticulonodular increase in interstitial markings, predominately in the lower lung fields," a non specific finding for interstitial disease in the lower lung fields. (*Id.*).

The medical records also include a referral sheet from the emergency room at Oak Forest Hospital dated November 29, 2002. (R. 206). The name of the physician who completed the referral is illegible. (*Id.*). The physician noted a history of enlarged lymph nodes and found that Allen had "interstitial changes in both lungs on CXR, CT chest, indicating an additional CT scan. (*Id.*). The diagnosis included a "productive cough," fatigue, and hemoptysis (coughing up blood). (*Id.*). The referral states that Allen discussed the following medications with a nurse: Medrol, Azmacort, and Albuterol. (R. 206-07).

An unidentified physician at John H. Stroger, Jr. Hospital ("Stroger") examined Allen on January 19, 2004. (R. 214-15). At that time, Allen report swelling of his hand and toe joints, constipation, and fatigue. (*Id.*). On February 8, 2004, an electrocardiogram analysis performed at Stroger revealed "sinus bradycardia with sinus arrhythmia with frequent premature ventricular complexes." (R. 212-13). The examining physician diagnosed Allen with lupus, constipation, and rheumatoid arthritis due to a positive ANA (antinuclear antibody) result and referred him to rheumatology and a social worker. (R. 211).

On February 27, 2004, Allen visited the Fantus Health Center Clinic ("Fantus"), complaining of morning stiffness; severe pain in his small digits, wrist, and knee; weight loss; constipation; a rash; and blue fingers in cold weather. (R. 253). The treating physician diagnosed "probable SLE" and ordered a serology, or blood serum study, which was positive for antinuclear antibody. (*Id.*). The physician also noted "+Raynaud's," indicating that Allen was positive for Raynaud's Phenomenon, also referred to as Raynaud's Syndrome.[1] (*Id.*). Allen received a prescription for 10 mg of Prednisone and 200 mg of Plaquenil. (R. 253).

According to the medical records, Allen continued to experience pain and stiffness in his fingers and wrists and returned to Fantus on April 2, 2004. (R. 230). The examining physician noted a diagnosis of lupus, Raynaud's Syndrome and anxiety. (*Id.*). Allen reported that he did not think his dosage of 10 mg of Prednisone "was enough" and the physician increased the claimant's prescription. (*Id.*). On May 25, 2004, Allen again

---

[1]Raynaud's Syndrome is a disorder that affects the blood vessels in the fingers, toes and other extremities and can result in pain and a sensation of burning or prickling.

sought treatment at Fantus.  (R. 252).  The records indicate that he complained of fatigue, swelling of the penis and blurred vision.  (*Id.*).

On April 28, 2004, Dr. Stanley Rabinowitz examined Allen for approximately 25 minutes at the request of the State of Illinois Disability Determination Services ("DDS"). (R. 216).   Allen reported a diagnosis of lupus since January 2004, and stated that his current medication regime included 20 mg of Prednisone and 200 mg of Plaquenil each day.  (*Id.*).  Allen complained of arthropathy, a disease of the joints with pain involving the feet, knees, wrists, and hands, with intermittent swelling of the hands;  joint stiffness; blurred vision; chronic constipation; memory difficulties; dizziness; and an occasional rash.  (*Id.*).  According to Dr. Rabinowitz's notes, Allen also complained of paresthesias, a sensation of tingling or numbness, involving the feet.  (*Id.*).  The doctor noted "a history of probable Raynaud's" and chronic fatigue  (*Id.*).   Throughout his treatment notes to the DDS, Dr. Rabinowitz consistently referred to Allen as a "she."  (R. 216).

Upon physical examination, Dr. Rabinowitz observed that Allen had a "fullness" in his elbows and crepitus in his knees.  (R. 217).  Dr. Rabinowitz determined that Allen's "grip strength in both hands [is] 70% of normal with mild impairment of digital dexterity" and that Allen had a "mildly decreased ability to make a fist with either hand."  (R. 217). The doctor found a normal range of motion without active joint inflamation, joint deformity, instability, or contracture.  (R. 218).  Dr. Rabinowitz concluded that Allen had a "history of systemic lupus erythematosus with constitutional symptoms and arthropathy."  (R. 218).

Dr. Robert T. Patey assessed Allen's residual functional capacity ("RFC") on June 24, 2004, based upon a primary diagnosis of lupus.  (R. 220-27).  Dr. Patey determined that Allen could lift/carry twenty pounds occasionally and ten pounds frequently, stand

and/or walk at least two hours in an eight-hour workday, and sit for about six hours in an eight-hour workday. (R. 221). He classified Allen's push/pull ability as "limited in upper extremities" and, when asked to justify that conclusion with specific facts, stated "not repetitively with upper extremities." (*Id.*). Dr. Patey noted the following postural limitations: never climb ropes or scaffolds and occasionally climb stairs or ramps, kneel, crouch, or crawl. (R. 222). He found no manipulative, visual, communicative or environmental limitations. (R. 223-24).

On October 5, 2004, Allen returned to Fantus, complaining of painful spasms in his fingers and toes, accompanied by a loss of feeling in his fingers, blurry vision and fatigue. (R. 229). Allen also reported that his fingers turn white and blue in the cold. (*Id.*). After a physical exam, which revealed no joint tenderness or swelling, the treating physician concluded that Allen's lupus was stable. (*Id.*). The treatment notes indicate that Allen was unhappy with his treatment at the health center and expressed a desire "to be placed on disability." (*Id.*). Allen again visited Fantus on January 4, 2005 and complained of "hand cramping, hand swelling, and nose bleeds." (R. 247). The treating doctor found "+Raynaud's," and lupus with "lots of fatigue," and reduced Allen's intake of Prednisone to 12.5 mg. (*Id.*). The doctor also prescribed Hydroxychloroquine and Amitriptyline. (*Id.*). On June 6, 2005, Allen received treatment at the Oak Forest Hospital emergency room for hematuria, the presence of blood in the urine. (R. 240, 310).

## II.    Claimant's Testimony

Allen testified at the August 23, 2005 hearing. (R. 283-308, 325-33). Allen's date of birth is January 4, 1968; he was 37 years old as of the hearing date. (R. 283). The claimant testified that he has a high school diploma, attended college, and received a

6

certificate as a security guard while working as a doorman. (R. 283-84). Allen also received training in car sales and briefly attended CarMax school. (R. 285, 288).

Allen testified that he has held a number of jobs since 1990. (R. 284, 295). Allen trained as a car salesman at Watson Motors for two weeks, but left because his frequent need to urinate, spasms in his hands and feet, and fatigue made it difficult to "make that schedule." (R. 285-86). Next, Allen worked as an overnight stocker for Target, stocking shelves and unloading trucks. (R. 286). This position required standing and lifting up to twenty-five pounds. (*Id.*). After leaving Target, Allen stocked shelves at the Dollar Store for one month. (R. 287). His duties were similar to those at Target, but the amount of weight he was required to lift was only ten to fifteen pounds. (R. 287).

Allen then worked at CarMax, where his duties included car sales, car detailing, and transporting cars between dealerships in different cities. (R. 287-88). He stated that detailing cars required him to stand, walk, drive, bend, and crouch. (R. 288). Allen subsequently worked at the Value City department store for several months. (R. 289). While at Value City, Allen's duties required him to stand and occasionally retrieve light boxes from storage. (*Id.*). Allen explained that he was employed at Value City for a short period because his position was seasonal – "a Christmas job." (R. 290).

Allen also worked as a stocker at a Wal-Mart department store. (R. 292). His duties at Wal-Mart were similar to those at his previous stocking jobs, although he was required to lift items that weighed up to forty pounds. (*Id.*). Allen explained that he left Wal-Mart because he wanted "to try to do something easier than lifting" and found a job in sales. (R. 300). Allen worked as a life insurance salesman for a period of five months. (R. 290). He explained that he went door-to-door collecting monthly premiums on his two-

hundred accounts.  (R. 290-91).

Allen's longest period of employment was at James Kilmer condominiums, where he worked as a doorman for five years.  (R. 293).  Allen's duties included calling cabs, helping residents with their luggage and making sure that the premises were secure.  (R. 294).  According to Allen, he "didn't get sick" until the end of his tenure at James Kilmer. (R. 298).  He testified that: "My body just got tired of the swing shift schedules I was doing. I was working [the] night shift ... 12:00 to 8:00."  (R. 298).  Allen said that he was scheduled to work two days a week, but usually worked extra hours in overtime.  (*Id.*). Although Allen's normal schedule was sixteen hours a week, he would work up to thirty-six hours per week filling in for other doormen.  (R. 299).  Allen testified that because of the overnight shifts, he noticed his strength becoming "smaller and smaller."  (R. 298-99). During this period, Allen "just got really burnt out period, physically exhausted over the time."  (R. 299).  He explained that for several years he worked the day shift, the afternoon shift, and the night shift, and after years of working this swing schedule, his "body just got really out of whack."  (R. 300).  When the ALJ asked Allen if he "quit because [he was] getting tired of the job," Allen answered that he did not quit, but was laid off for a period and "could not make it back there."  (R. 298).

Following James Kilmer, Allen worked at a McDonald's restaurant for one month as a cook and food bagger.  (R. 295).  He also bagged groceries at a Dominick's grocery store for a few months.  (R. 292-93).  Allen left Dominick's because of the commute and then worked in a temporary telemarketing job.  (R. 298).

When asked by the ALJ why he held most jobs for a short period of time, Allen explained that he "took sick" and "didn't know it."  (R. 297).  ALJ White then asked "[i]f you

didn't know it then why were you leaving these jobs," and Allen responded that he could not meet the exertional requirements of the positions he held. (*Id.*). He further explained that "I got sick. I got pink eye and I didn't know that my resistance would go down, and I was just fatigued." (*Id.*). Allen also stated:

> I took ill. I went in to find out a month later that I had lupus, and that's what happened to me.... I took Ill. I caught, I didn't know I was sick. I didn't know why the symptoms were coming in, and after 2000 I had taken ill. I had become ill with something I did not understand and I did not have health insurance at the time, but in January became the discovery of what was going on with me.

(R. 297-98).

Allen testified that he first started to experience symptoms of lupus in 2000. (R. 301). Allen recalled that after catching pink eye during his tenure as a insurance salesman, he started experiencing fatigue and became "exhausted beyond understanding." (R. 301-02). Soon after, Allen began experiencing "night sweats." (R. 303). Allen explained that he did not see a doctor at the time because "I didn't have medical insurance and I thought maybe this was something I would get over ... [and] I liked making my paycheck." (R. 303).

Allen testified that, while working for CarMax, he would sometimes experience sudden nose bleeds and urinary problems. (R. 305, 307). He would combat his growing fatigue with caffeine, but the effects of the caffeine eventually wore off and he "would go even worser down." (R. 305). Allen stated that his schedule required him to work until 11:00 p.m. and then attend sales meetings early the following morning. (R. 306). According to Allen, his fatigue caused him to miss sales meetings. (R. 305). He recalled that the nose bleeds convinced him that "something was wrong," but he did not have medical insurance and therefore did not see a doctor. (R. 306). Allen did not seek

treatment until his joints became "so tight and stiff that [he] could hardly get to the bathroom." (R. 307).

The ALJ questioned Allen's transition from insurance sales to working as a stocker at Value City, which required more lifting than the insurance job. (R. 303-04). Allen responded that he did not lift heavy objects at Value City, and his main duties included selling watches and jewelry. (R. 304). After Allen left the car salesman position at CarMax, he moved to a stocker position at Target and the Dollar Store. (R. 307). He noted that neither job required heavy lifting, but he was still experiencing fatigue. (R. 307).

Allen testified that the day prior to the hearing, he "slept" until 12:30 p.m. or 1:00 p.m. (R. 325). After Allen awoke, he did "absolutely nothing" because of fatigue caused by prescription sleeping pills. (R. 325-26). Allen regularly has trouble sleeping and generally sleeps four or five hours in a twenty-four hour period. (R. 327). However, Allen said that when the lupus "hits" him during the day, he tries to fight sleeping because "it's pretty depressing to find yourself falling asleep when you want to be up." (R. 327).

Allen stated that he suffers from a variety of impairments and illnesses. (R. 328-33). Allen testified that he has memory problems and, as an example, stated that he had become lost while driving on a street that he normally travels. (R. 328). Allen also suffers from headaches. (R. 329). He takes Excedrin, but claims the medication upsets his stomach and forces him to lay down. (*Id.*). Allen recalled visiting a doctor about a urinary tract infection, and stated that he suffered a finger and toenail infection, as well as lesions on his arms, legs, and scrotum. (R. 329-30).

Allen described weakness in his hands, and stated that he has problems gripping things tightly and with his "joints and stuff." (R. 331). Allen recalled that around the time

10

he left his job at Target, he had trouble walking due to stiffness in his joints. (R. 331-32). He also had problems with his immune system and his circulation. (R. 332). Allen explained that when the temperature is "not really warm," his hands and feet turn white, and he loses feeling and cannot bend them. (R. 332). Allen first noticed this problem during the winter of 2002. (R. 333). Finally, Allen testified that he suffers spasms and cramping in his feet, hands, and face. (R. 333).

### III.    Testimony of Claimant's Wife

The claimant's wife, Christel Allen ("Christel"), testified at the hearing. (R. 338-45). According to Christel, over the previous few years Allen has been "very tired, cramping in the hands and feet, he's sleeping long hours ... [and] he can have a bad day." (R. 340). She defined a "bad day" as one where Allen has trouble falling asleep, and consequently sleeps late and has bad headaches. (*Id.*). Christel stated that Allen started breaking out in rashes two years ago and can't handle stress because it "really activate[s] his lupus." (R. 341).

When asked about the claimant's problems at work, Christel stated that he had trouble lifting stock and staying at work for the duration of his shift due to fatigue. (R. 341). She also described insomnia, fever and "sweats." (R. 342). According to Christel, Allen's symptoms existed before he was diagnosed with lupus. (R. 341). They did not have insurance at the time, which prevented Allen from seeking treatment. (*Id.*). At some point, Allen started "bleeding." (*Id.*). Eventually, Allen's nose bleeds and bloody urine prompted him to seek medical attention, leading to the diagnosis of lupus. (R. 341-42). According to Christel, Allen's symptoms got worse during the period leading up to his diagnosis. (R.

342).

Christel stated that she works full-time, and that both Allen and Christel's mother take care of their children. (R. 339). She explained that "if [Allen] is having a bad day, I take [the children] to my mom's." (*Id*.). Occasionally Christel's mother "checks in" on the children when Allen watches them. (*Id*.). According to Christel, Allen will "wash a dish here or two," "try to vacuum" and "make the bed," but otherwise isn't able to help with the housework. (R. 343-44). She described her husband as a "hard worker" who has "always taken care of us and the kids" and "would work an eight hour job if he could." (R. 343).

## IV.    Medical Expert's Testimony

The medical expert, Dr. Chukwuemeka Ezike ("ME Ezike"), also testified at the hearing. (R. 308-25). ME Ezike is Board Certified in internal medicine and occupational medicine, and has handled "hundreds" of lupus cases. (R. 309). ME Ezike reviewed the claimant's medical records, which he found sufficient to render an opinion on Allen's medical conditions. (R. 309-10). ME Ezike found that the records "indicate that the claimant has a history of systematic lupus erythematosus ... interstitial lung disease, and constipation." (R. 310). However, ME Ezike concluded that "there was not enough evidence in the medical records" to establish that the claimant met the listing for lupus. (R. 322). He lacked medical "records to indicate what is causing the problem," rather than mere diagnoses. (R. 323).

ME Ezike testified that Allen's medical records primarily include  "symptoms or complain[t]s of fatigue, pains, and swelling as present in his fingers." (R. 311). He noted a mention of hemoptysis, or coughing up blood. (*Id*.). ME Ezike opined that hemoptysis is

12

possible with lupus where there is a related infection in the lungs, however he did not find this diagnosis in claimant's medical records.  (*Id.*).  He testified that the claimant's CT scan showed a type of lung disease "more on the business of the lung which is also compatible with the lupus."  (*Id.*).

According to the medical examiner, lupus is a "multi-system disease" that can affect any part of the body.  (R. 321).  He stated that urinary frequence is a possible, but not typical, symptom of lupus.  (*Id.*).  The "more common" symptom is hematuria, which is blood in the urine.  (*Id.*).  ME Ezike stated that night sweats could be a result of lupus.  (R. 311).  He acknowledged that pink eye may be associated with lupus, but he could not determine if Allen's pink eye was due to lupus without a physical exam or definitive diagnosis of pink eye in the medical records.  (R. 310-11).  ME Ezike described Allen's diagnosis of arthropathy as a disease of the joint that could be "other inflammation" or "just an infection."  (R. 310).  ME Ezike opined that it was possible for Allen's fatigue to be a symptom of lupus.  (R. 318).  He stated that chronic fatigue is a symptom of lupus, but is not part of the medical criteria for diagnosis.  (R. 318).  ME Ezike acknowledged that chronic fatigue associated with lupus can be disabling and may prevent a person from performing a light duty job.  (R. 318-19).

In response to questions from Allen's attorney, ME Ezike stated that, while not typical,  blurred vision could be a symptom of lupus.  (R. 320).  He testified that skin rashes could be an allergic reaction to medication.  (*Id.*).  The doctor opined that numbness or tingling of the feet and skin lesions, particularly lesions on a patient's arms, could be consistent with lupus.  (R. 321).  ME Ezike stated that constipation is also a possible, albeit atypical, symptom of lupus.  (*Id.*).  He noted that Allen's records indicate

13

diagnoses of constipation and dyspepsia, conditions that could be due to lupus. (R. 323). Allen's interstitial lung disease could also be attributed to lupus, but Allen's records did not include a diagnosis from a pulmonologist as is necessary for that determination. (R. 318). ME Ezike further observed that the record did not include a diagnosis from an ophthalmologist that Allen's eye problems were due to lupus. (R. 324).

ME Ezike concluded that Allen's functional limitations would depend on how the claimant responds to treatment. (R. 312). ME Ezike explained that during one documented examination, Allen demonstrated a reduced grip strength with reduced manual dexterity, which may limit his ability to perform tasks that require fine manipulation. (R. 312-13). Therefore, he concluded that it is "possible" for Allen to have a mild impairment in digital dexterity. (R. 313). ME Ezike also noted mild problems with Allen's fine movement of his hands and claimant's reports of puffiness in his joints. (*Id.*).

The medical examiner opined that since Allen was responding to treatment, he should be capable of performing light duty, with a mild limitation in fine manipulation and no ladders, scaffolds, or anything similar. (R. 314). With regard to pulmonary restrictions, ME Ezike opined that Allen "should not be exposed to irritants, respiratory irritants, and fumes, avoid fumes." (*Id.*). When asked if Allen should avoid concentrated levels of the specified irritants, ME Ezike responded affirmatively. (R. 314). ME Ezike testified that he would place no further limitations on the claimant. (R. 316).

## V. Vocational Expert's Testimony

Glee Ann Kher, a vocational expert ("VE Kher"), also testified at the hearing. (R. 334–38). VE Kher opined that Allen's work as a security guard is considered light and the physical demands of a security guard are very low and semi-skilled in nature. (R. 334).

14

Allen's stacker positions fall between medium and heavy physical demand. (R. 335). VE Kher stated that Allen's car sales position is light, semi-skilled, and not sedentary or transferrable. (*Id.*). The insurance sales position is light and semi-skilled. (*Id.).* VE Kher noted that Allen's sedentary insurance sales job is "higher skilled" and not transferable down to sedentary. (*Id.*).

The ALJ posed a question to VE Kher, asking if a hypothetical person of the claimant's age, education, and work experience, with the following conditions, could perform any of the claimant's past work: the hypothetical person had the RFC for light work with no climbing of ladders, ropes or scaffolds; would be able to occasionally climb stairs and ramps, balance, crouch or crawl; must avoid concentrated exposure to pulmonary irritants; and would not be able to perform past and fine manipulation, but could frequently reach and perform fine manipulation. (R. 335). VE Kher responded that the medium to heavy positions, including the car sales position as performed by Allen, would be precluded. (*Id.*). However, the hypothetical person would be able to perform the insurance sales and door security jobs. (R. 336).

Claimant's counsel then asked what would happen if the hypothetical person was unable to meet his work schedule on a day-to-day basis due to chronic tardiness or absence. (*Id.*). VE Kher replied that the person would generally be written up. (*Id.*). She further testified that "the tolerance for that is generally five to ten workdays per year," after which time the hypothetical person would be terminated. (*Id.*).

VE Kher observed that Allen's insurance sales job required as much as six hours of walking per day and his door security position required standing up to six hours a day. (R. 336-37). VE Kher opined that these jobs are still considered light since "by definition light

is standing and or walking [a] combination [of] as much as six hours." (R. 337). She acknowledged that if the hypothetical person could not stand for up to six hours he "probably" could not maintain either the insurance sales or security jobs. (*Id.*). "[I]f an individual could not stay standing long enough to finish doing what they needed to be doing, then ultimately they'd be written up and terminated." (R. 337). Finally, VE Kher opined that naps are not allowed in any type of "competitive employment." (R. 338).

**LEGAL ANALYSIS**

**I.      Standard of Review**

This Court must affirm the ALJ's decision if it is supported by substantial evidence and free from legal error. 42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is more than a scintilla of evidence and is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995), *quoting Richardson v. Perales*, 402 U.S. 389, 401 (1971). We must consider the entire administrative record, but will not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner." *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003), *quoting Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). Rather, this Court must "conduct a critical review of the evidence" and not let the Commissioner's decision stand "if it lacks evidentiary support or an adequate discussion of the issues." *Lopez,* 336 at 539. While the ALJ must "build an accurate and logical bridge" from the evidence to his conclusion, he need not discuss every piece of evidence in the record. *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001); *see, also Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) ("[W]e cannot uphold a decision by an administrative agency ... if, while

there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result.")  However, the ALJ must "sufficiently articulate his assessment of the evidence to assure us that the ALJ considered the important evidence...and to enable us to trace the path of the ALJ's reasoning."  *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (*quotations omitted*).

## II.    Analysis Under the Social Security Act

In order to receive disability insurance benefits under the Social Security Act, the claimant must establish that he is under a disability.  A person is disabled under the Act if "he or she has an inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A).

The ALJ must consider the following five-step inquiry in connection with the disability determination: "(1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling ('a listing-level impairment'), (4) if the claimant does not have a conclusively disabling impairment, whether []he can perform h[is] past relevant work, and (5) whether the claimant is capable of performing any work in the national economy."  *Dixon*, 270 F.3d at 1176.  The claimant has the burden of establishing a disability at steps one through four. *Zurawski*, 245 F.3d at 885-86.  If the claimant reaches step five, the burden then shifts to the Commissioner to show that "the claimant is capable of performing work in the national economy."  *Id.* at 886.

The ALJ followed this five step analysis.  At step one, ALJ White found that Allen has not engaged in substantial gainful activity since the onset of his disability.  (R. 30).  At step two, the ALJ found that his impairment, including systemic lupus with related complaints of interstitial changes in the lung fields, met the definition of "severe" for purposes of the analysis.  (R. 28, 30).  At step three, he found that even though Allen's ailments were severe, they did not equal any impairment that the Commissioner considered conclusively disabling.  (R. 28, 30).  Therefore, ALJ White moved on to step four to determine whether Allen could perform his past relevant work.

With regard to Allen's professed functional limitations, ALJ White found the claimant generally not credible.  (R. 29).  The ALJ concluded that Allen had the following residual functional capacity: "to perform light work with no climbing ladders, ropes or scaffolds, no constant gross or fine manipulation and must avoid concentrated exposure to pulmonary irritants."  (R. 30).  Accordingly, at step four, ALJ White found that Allen could perform his past relevant work as an insurance sales agent and security guard, and therefore does not qualify for disability benefits.  (R. 30-31).

Allen claims that ALJ White's decision is in error.  Specifically, Allen argues that: (1) the ALJ's credibility determination is flawed; (2) the ALJ failed to properly assess Allen's fatigue; (3) the ALJ failed to properly consider Allen's combination of impairments and symptoms; and (4) the ALJ failed to properly weigh and evaluate the medical evidence. We begin with the ALJ's credibility determination.

### A.    The ALJ's Credibility Determination is "Patently Wrong"

The ALJ is in the best position to evaluate the credibility of a witness, therefore we afford his credibility determination special deference.  *Powers v. Apfel*, 207 F.3d 431, 435

(7th Cir. 2000), *citing Nelson v. Apfel*, 131 F.3d 1228, 1237 (7th Cir. 1997).  Here, ALJ

White found Allen "generally not credible."  (R. 29).  This Court will reverse the ALJ's

determination only if the claimant can show it was "patently wrong."  *Powers,* 207 F.3d at

435.

ALJ White identified a number of inconsistencies in the claimant's testimony which

caused him to conclude that Allen is generally not credible.  The ALJ observed that Allen

and Christel testified that the claimant "had such severe fatigue that he spent most of the

day lying down and that his memory is so poor he forgets where he is driving his car."  (R.

29).  The ALJ found this testimony inconsistent with the testimony that the claimant

"frequently baby sits his children while his wife is at work."  (*Id*.).  Relying on this

inconsistency, ALJ White observed that the claimant "would not be trusted with the care

and welfare of his children if he was so unable to give attention to them."  (*Id*.).   Therefore,

the ALJ concluded that "the claimant is able to baby sit his children because his condition

does not prevent him from doing so."  (*Id*.).

In fact, neither the claimant nor his wife testified that Allen spends most of the day

laying down.  Christel testified that on "bad days" the claimant sleeps late.  (R.  340).  Allen

testified that he sometimes sleeps late but fights sleeping during the daytime because he

doesn't like to "completely miss out on his day." (R. 325-26, 328).  Christel testified that

her mother helps to care for their children, and will "check in" when the children are at

home with the claimant.  (R. 339).   According to Christel, when Allen has a "bad day" of

lupus-related fatigue, she takes their children to her mother's house.  (*Id*.).  ALJ White did

not determine how often Christel drops her children off at her mother's house, or how often

her mother comes over to help watch the children.

Moreover, ALJ White did not articulate how Allen's testimony that he's "gone out and gotten lost" on a road he normally travels demonstrates that he is unable to care for his children. Presumably, the ALJ found that if Allen's memory was, in fact, poor, he would be unable to remember the safety of his children. However, the ALJ can not rely on inferences and must instead articulate his reasoning. *See Steele*, 290 F.3d at 941 ("Regardless whether there is enough evidence in the record to support the ALJ's decision, principles of administrative law require the ALJ to rationally articulate the grounds for [his] decision and confine our review to the reasons supplied by the ALJ.") On remand, ALJ must cite "specific reasons for the finding on credibility, supported by the case record" that are "sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave the individual's statements and the reasons for that weight." *Zurawski*, 245 F.3d at 887, *quoting* SSR 96-7.

ALJ White also found the claimant's testimony regarding his vocational history, specifically his frequent job changes, was not credible. ALJ White observed that: "the claimant testified that [he changed jobs] ... because he was sick but did not know it. If he did not know he was sick, why would he act upon the knowledge that he was sick and change jobs?" (R. 29). However, Allen testified that at that time he was not aware of a specific medical condition, but knew he had a physical illness. (R. 298) ("I didn't know I was sick. I didn't know why the symptoms were coming in ... I had become ill with something I did not understand and I did not have health insurance at the time.") Allen also described the symptoms that ultimately led to his diagnosis of lupus. (R. 298-303). On remand, the ALJ must rely on specific facts, rather than unsupported assertions, to support his credibility determination.

The ALJ also mischaracterized Allen's testimony that he became "burnt out" while working as a doorman at James Kilmer. In his opinion, ALJ White wrote that "[Allen] was working 16 hours per week as a doorman, but when they increased his hours to 32 to 36 hours, he got burned out by the heavy workload. This implies that the claimant is not greatly motivated to work." (R. 29). However, Allen testified that his normal work week was 16 hours. (R. 299). When he began filling in for co-workers, he began to work longer hours and different shifts, including overnight shifts. (R. 299). Allen explained that he became physically exhausted, "burnt out" in his words, from working the increased and unpredictable hours. (R. 299-300). ALJ White's determination that Allen's "burning out" resulted from a lack of motivation is not supported by the record.

ALJ White's conclusion that Allen lost his job in car sales because he failed to attend sales meetings, indicating a lack of motivation to work, also lacks evidentiary support. (R. 29). Allen testified that he began to experience nose bleeds and frequent urination while at CarMax and his fatigue, exacerbated by his erratic schedule, primarily contributed to his absences from the morning meetings. (R. 305, 307). On remand, ALJ White must reconsider his conclusion that Allen had a lack of motivation to work.

**B.      The ALJ Did Not Analyze Claimant's Fatigue**

The claimant alleges that ALJ White failed to properly address his allegations of severe fatigue. SSR 96-8p requires that "the RFC assessment include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." SSR 96-8p at *6; *see, also Briscoe v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005). Here, the ALJ only briefly mentions Allen's fatigue in observing that if Allen had spent "most of the day lying

down," then "he would not be trusted with the care and welfare of his children," and he was therefore not credible. (R. 29). However, the record includes numerous discussions of Allen's fatigue. Both Allen and Christel testified that he suffers from severe fatigue. (R. 285-86, 297-302, 305, 307, 327-28, 341, 343). The medical records include frequent complaints of chronic fatigue. (R. 214, 216, 229, 247, 252, 229). Moreover, ME Ezike acknowledged that chronic fatigue is a symptom of lupus and can be disabling (R. 318-19), while VE Kher testified that a person who was chronically late or absent from work, who could not stand long enough to finish a task, and who required naps during the day, could not sustain competitive employment. (R. 336). Despite these numerous references, it is unclear if, or to what extent, ALJ White considered Allen's fatigue in concluding that he has the residual functional capacity to perform light work with certain specified limitations. (R. 28-29). On remand, the ALJ must discuss how Allen's fatigue affects his ability to work. *See* SSR 96-8p.

### C. The ALJ Failed to Consider Allen's Raynaud's Syndrome and Medication

Next, the claimant argues that ALJ White did not properly consider Allen's combination of impairments and symptoms, specifically claimant's diagnosis of Raynaud's Syndrome, in the RFC assessment. In his opinion, ALJ White correctly notes that in making the RFC determination, he must consider all of Allen's symptoms, including pain, and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence. (R. 28). The ALJ notes that Allen had been "found to have Raynaud's neuropathy with complaints of pain in 2-4 fingers on the left hand and both wrists." (R. 28). However, ALJ White did not mention Raynaud's in connection with

22

Allen's RFC.  *See* SSR 96-8p at \*6 (ALJ's RFC assessment "must include a discussion of why symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with medical and other evidence.")  ALJ White neglected to discuss several other conditions alleged by the claimant, including headaches (R. 190, 329, 340), frequent urination (R. 285, 329), constipation (R. 181, 191, 211-12, 214-15, 253, 310, 321, 323), and recurring nose bleeds (R. 247, 305-07, 341-42).  The Commissioner argues that these conditions need not be included in the RFC as they are "allegations that the ALJ reasonably rejected."  However, in his opinion ALJ White merely notes the existence of these conditions, he does not explain why they were rejected.  *See Indoranto v. Barnhart*, 374 F.3d 470, 473 (7th Cir. 2004) ("Although the ALJ need not discuss every piece of evidence in the record, he must confront the evidence that does not support his conclusion and explain why it was rejected.")  Accordingly, on remand, ALJ White must consider Allen's Raynaud's Syndrome, headaches, frequent urination, constipation and the recurrent nose bleeds, and any resulting limitations.

The claimant further argues that remand is appropriate because ALJ White failed to consider his medication regime.  SSR 96-7p requires the ALJ to consider several factors including the "type, dosage, effectiveness, and side effects of any medication" when considering allegations of pain and other symptoms.  SSR 96-7p; 20 C.F.R. § 404.1529(c)(3).  Here, ALJ White makes no mention of a number of medications taken by the claimant, including Medrol (R. 206), Azmacort (R. 206), Albuterol (R. 206), Excedrin (R. 329) and Amitriptyline (R. 141, 247, 326).   Other medications are mentioned in the opinion, but without any discussion of the type, dosage, effectiveness, and side effects of the medications.  For instance, ALJ White briefly mentions Plaquenil (also known as

Hydroxychloroquine) and relies on the reduction of Allen's Prednisone to support the conclusion that the claimant's lupus was stable (R. 27, 29). However, the ALJ did not discuss the side effects of the drugs. On remand, ALJ White should address the dosage, effectiveness, and side effects of the claimant's medication regime.

### D. The ALJ Failed to Explain the Weight Given to Various Medical Opinions in the Record

The claimant next argues that ALJ White erred in giving greater weight to ME Ezike's determination that Allen could perform light work "because it appeared more consistent with the record and with [the] determination of the claimant's credibility and capability for babysitting children during the day." (R. 29). As discussed above, the portion of the ALJ's credibility determination that discusses Allen's occasional babysitting is not supported by the record. On remand, ALJ White must reconsider the weight given to ME Ezike's opinion in light of the revised credibility determination.

Allen further argues that remand is justified because ALJ White failed to resolve a conflict in ME Ezike's testimony. This Court disagrees. During the hearing, ME Ezike opined that Allen should not be exposed to irritants, respiratory irritants and fumes, given his interstitial lung disease. (R. 314). The ALJ asked the doctor: "So avoid concentrated levels of that?" (R. 314). The doctor replied: "Yes." (R. 314). The apparent ambiguity of whether Allen was to avoid *concentrated* exposure to pulmonary irritants or to avoid them altogether was never resolved. However, "[n]o principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result." *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989). There is no evidence in the record that the past relevant work of the

claimant as an insurance sales agent and security guard would expose him to any appreciable level of pulmonary irritants, nor is there any basis for this Court to conclude that remand on this issue would lead to a different result.  Nonetheless, in order to minimize the likelihood of further litigation, the ALJ should resolve this ambiguity on remand.

**CONCLUSION**

For the reasons set forth above, Allen's motion for summary judgment is granted, and the Commissioner's motion for summary judgment is denied.  This case is remanded to the Social Security Administration for further proceedings consistent with this opinion.  It is so ordered.

**ENTERED:**

_____
**MICHAEL T. MASON**
**United States Magistrate Judge**

**DATED: November 13, 2008**